# FRANKLIN DEPOSITION

COPY

1

1   UNITED STATES DISTRICT COURT

2   FOR THE CENTRAL DISTRICT OF CALIFORNIA
    ------------------------------------x
3   SERENDIP LLC & WENDY CARLOS,

4                           Plaintiffs,

5              -against-

6   WARNER BROS. ENTERTAINMENT INC.,

7                           Defendant.

8   Case No. CV08-07739
    ------------------------------------x
9

10
                           One Time Warner Center
11                         New York, New York

12
                           September 16, 2009
13                         10:00 a.m.

14

15              Videotaped deposition of ANNEMARIE

16   FRANKLIN, held at the offices of Time Warner,

17   Inc., pursuant to notice, before Barbara Driscoll,

18   a Notary Public of the State of New York.

19

20

21

22

23         ELLEN GRAUER COURT REPORTING CO. LLC
              126 East 56th Street, Fifth Floor
24                 New York, New York 10022
                      212-750-6434
25                     Ref: 91146

18

1                          FRANKLIN

2               Then I worked in the insurance industry

3      for about 16 years.

4          Q.    What did you do in the insurance

5      industry?

6          A.    I was an actuary.

7          Q.    Did you do anything else prior to law

8      school, professionally?

9          A.    Well, I started Serendip.

10          Q.    When did you start Serendip?

11          A.    1980.

12          Q.    We will come back to that.

13               You worked for the government.  You

14      were an actuary.  You started Serendip in 1980.

15      Any other professional experience before law

16      school?

17          A.    No.

18          Q.    You went to law school in 1986 at

19      Columbia?

20          A.    Yes.

21          Q.    When you graduated from law school, did

22      you practice law?

23          A.    After I was admitted to the bar, yes.

24          Q.    When were you admitted to the bar?

25          A.    January 1990, in New York.

21

1                           FRANKLIN
2      partnership.
3           Q.     Who were the partners in Serendip?
4           A.     Wendy Carlos and me.
5           Q.     Do you also have a personal
6      relationship with Ms. Carlos?
7           A.     Yes.
8           Q.     When did your personal relationship
9      with Ms. Carlos begin?
10          A.     1979.
11          Q.     Are you and Ms. Carlos legally married
12     in any state?
13          A.     No.
14          Q.     Do you still have a personal
15     relationship with Ms. Carlos?
16          A.     Yes.
17          Q.     What was the purpose of the Serendip
18     partnership when it was formed in 1980?
19          A.     The production and promotion of Wendy
20     Carlos' music and any other projects we wanted to
21     get into.
22          Q.     At some point, did the form of Serendip
23     change from a partnership to an LLC?
24          A.     Yes.
25          Q.     When was that?

22

1                          FRANKLIN

2          A.      The end of 1999.

3          Q.      Why did you do that?

4          A.      Because the law developed the LLC --

5     New York State had passed an enabling statute for

6     limited liability companies and there are certain

7     advantages to its structure.

8          Q.      Other than yourself and Ms. Carlos, are

9     there any other members of Serendip?

10         A.      No.

11         Q.      Have there ever been any other members

12    other than yourself and Ms. Carlos?

13         A.      There have not been.

14         Q.      Who has the authority to enter into

15    contracts on behalf of Serendip?

16         A.      I guess either partner but -- either

17    member probably under the law.  I don't know.  It

18    is a legal question.

19         Q.      Not necessarily.

20                 Where does Serendip keep its records?

21         A.      At its physical location.

22         Q.      That is at 830 Rock --

23         A.      830 Broadway.

24         Q.      Is that also your home?

25         A.      Yes.

23

FRANKLIN

1

2          Q.    And Ms. Carlos' home?

3          A.    Yes.

4          Q.    Are those records kept separate from

5     your personal records?

6                MR. COHN:  Objection to the form.

7                You can answer it if you understand it.

8          A.    Well, I try to keep them separate, but

9     -- you know.

10         Q.    Do you receive compensation from

11    Serendip?

12         A.    No.

13         Q.    What role do you play at Serendip?

14         A.    I am the business member -- the LLC

15    member manager is the designation under the tax

16    law.

17         Q.    What are your duties as the LLC member

18    manager?

19         A.    I take care of the business side.

20         Q.    What does that mean?

21         A.    It means that I handle anything

22    relating to business, contracts or accounting or

23    the banking, all the -- any typical business

24    activity, acquisition of materials.

25         Q.    Acquisition of what?

25

FRANKLIN

1

2      A.      For which we own the copyright.

3      Q.      Is Ms. Carlos a member of a performing

4  rights society?

5      A.      Yes.

6      Q.      Which one?

7      A.      BMI.

8      Q.      Does Serendip have any employees?

9      A.      No.

10     Q.      Is one of your responsibilities for

11 Serendip to police the copyrights?

12     A.      Yes.

13     Q.      What does that entail?

14     A.      Well, it involves checking various

15 sources which you find -- often find music being

16 used that hasn't been authorized.

17     Q.      What are those sources?

18     A.      Well various things are on line.  For

19 example, e-bay, UTube, Napster and other MP 3 type

20 sites.  We also get hints from people who write to

21 wendycarlos.com and tell us about uses.

22     Q.      Anything else?

23     A.      I can't think of anything specific.

24 There are probably others.

25     Q.      Describe what your practice is with

26

1                           FRANKLIN

2    respect to looking at UTube; what do you do?

3         A.    I search for uses of music by whatever

4    means I can figure out to do.

5         Q.    What means are those?

6         A.    You have to search for key words.

7         Q.    What key words do you use?

8         A.    I search for Wendy Carlos' name.  I

9    search for names of particular pieces of music.  I

10   search for names of certain motion pictures.

11        Q.    You mentioned wendycarlos.com.  What is

12   that?

13        A.    It is a personal website for Wendy

14   Carlos.

15        Q.    Who maintains that website?

16        A.    She does -- or Serendip does, you know.

17   It is mainly her.

18        Q.    About how much of your time on average

19   do you spend policing the copyright on these

20   various internet sites?

21        A.    Not very much, I mean, because it is --

22   to search -- I do it once a week or something.

23        Q.    Why do you do that?

24        A.    Because I find things that are

25   .unauthorized and they are damaging -- potentially

27

1                          FRANKLIN
2     damaging to our rights, Serendip's rights or Wendy
3     Carlos' rights.
4          Q.     How in your view are UTube clips
5     potentially damaging to Ms. Carlos' rights or
6     Serendip's rights?
7          A.     UTube?
8          Q.     UTube.
9          A.     Because they are a potential use of
10    revenue source to someone else on the basis of
11    copyright which we own.
12         Q.     You mentioned e-bay.
13                You're not talking about reselling of
14    lawfully purchased material?
15         A.     No.
16         Q.     What is on e-bay?
17         A.     E-bay often finds pirate things,
18    unauthorized CD's.  I also find use of Wendy
19    Carlos' name to sell someone else's work.
20                MS. BURROW:  I will place before you
21           what we will mark as Exhibit 3 which is a
22           one-page document titled copyright assignment.
23                (Exhibit 3, copyright assignment,
24           marked for identification, as of this date.)
25         Q.     Ms. Franklin, do you recognize

28

1                        FRANKLIN
2    Ms. Carlos' signature?
3         A.    Yes, I do.
4         Q.    Did you draft this document?
5         A.    Yes, I did.
6         Q.    When did you do that?
7         A.    I don't remember exactly.  A few years
8    ago.
9         Q.    Because it is not dated, correct?
10        A.    It is not dated.
11        Q.    Was it prior to filing this lawsuit?
12        A.    Yes.
13        Q.    Was it prior to 2007?
14        A.    Yes.
15        Q.    What was the purpose of this document?
16   I am not asking for a privilege question.  I am
17   asking for a business question.
18        A.    It was to provide a written record of a
19   previous oral assignment.
20        Q.    When was the oral assignment?
21        A.    1984, I believe the document says that.
22        Q.    This purports to assign music
23   composition, arrangements and master sound
24   recordings created from 1968 through 1980 on
25   behalf of Trans-Electronic Music Productions,

31

1                           FRANKLIN

2    consideration for her ownership in TEMPI which

3    previously owned this?

4              MR. COHN:  If you know.

5         Q.    If you know.

6         A.    The consideration cited there was --

7    which was the Serendip assuming the obligation for

8    finishing the CBS contract was for her benefit.

9         Q.    Other than the consideration cited on

10   Exhibit 3, you're not aware of any consideration

11   to Ms. Elkind or any -- consideration or payment

12   or anything of value to pay to Ms. Elkind with

13   respect to whatever ownership rights she may have

14   had in the prior owner of the copyrights that are

15   being assigned in Exhibit 3?

16        A.    I am not personally aware of it.

17        Q.    Is Serendip aware of any such

18   consideration?

19        A.    I -- no.  Personally on behalf of

20   Serendip or myself, I can't say what it was, no.

21              MS. BURROW:  Exhibit 4 is an undated

22        agreement between TEMPI and Polaris

23        Productions, Inc.

24              (Exhibit 4, undated agreement between

25        TEMPI and Polaris Productions, Inc., marked

32

1                    FRANKLIN

2          for identification, as of this date.)

3          Q.    Ms. Franklin, have you seen this

4     document before?

5          A.    Yes.

6          Q.    If you look at the last page, you see

7     it is signed -- there is a signature block that

8     says agreed and accepted, Trans-Electronic Music

9     Productions, Inc. -- there are two signatures.

10         A.    Yes.

11         Q.    One of those purports to be Rachel

12    Elkind.  Do you see that?

13         A.    Yes.

14         Q.    Do you recognize Ms. Elkind's

15    signature?

16         A.    I have seen it before.

17         Q.    One purports to be Walter Carlos and

18    that is Ms. Carlos, correct?

19         A.    Yes.

20         Q.    You didn't draft this agreement,

21    correct?

22         A.    No.

23         Q.    When was the first time you saw this

24    agreement?

25         A.    Two years ago.

33

1                          FRANKLIN
2          Q.    What was the occasion on which you saw
3     this agreement two years ago?
4          A.    I wrote a letter to Warner Brothers.
5                MS. BURROW:   Please mark this document
6          as Exhibit 5.
7                (Exhibit 5, letter dated September 24,
8          2007, marked for identification, as of this
9          date.)
10               MS. BURROW:   I just marked as Exhibit
11         5, a letter on stationery that says Annemarie
12         Franklin to Alan Horn at Warner Brothers.
13         Q.    Is this the letter you're referring to?
14         A.    Yes.
15         Q.    Prior to this letter which I believe is
16    dated September 24, 2007, based upon subsequent
17    communication, that prior to drafting this letter,
18    you had not reviewed the agreement that we just
19    marked as Exhibit 4?
20         A.    I had not.
21         Q.    Looking back at Exhibit 4, what was
22    your understanding of the purpose of this
23    agreement?  Again, I am not asking you for a legal
24    conclusion, but --
25         A.    Are we talking about Exhibit 4?

37

1                    FRANKLIN
2       for identification, as of this date.)
3            MR. COHN:  The complaint or the amended
4       complaint?
5            MS. BURROW:  The amended complaint.
6       Q.   Before we look at Exhibit 6, looking
7  back at Exhibit 5 which is your September 24
8  letter to Mr. Horn, if you look at the third
9  paragraph of that letter, that begins the
10 unlicensed music?
11      A.   Yes.
12      Q.   I will read it because it is short.
13           "The unlicensed music use in the
14 aforementioned documentaries is only the tip of
15 the iceberg in that none of the music by Wendy
16 Carlos for A Clockwork Orange appears to have been
17 licensed by Warner Brothers for home video, DVD or
18 download use."
19           Do you see that?
20      A.   Yes.
21      Q.   Is the basis for that statement the
22 agreement we marked as Exhibit 4?
23      A.   The agreement that is marked Exhibit 4
24 is the licensing agreement for the music, so if it
25 is not in there, it is not in there.

38

1                     FRANKLIN

2          Q.    Just to be clear, when you say that

3     none of the music by Wendy Carlos for Clockwork

4     Orange appears to have been licensed by Warner

5     Brothers, you're basing that on your review of

6     Exhibit 4?

7          A.    Well --

8                MR. COHN:   You can answer that.

9          A.    The answer is yes and no.

10         Q.    What do you mean by yes and no?

11         A.    At the time I wrote the letter, I

12    hadn't seen the agreement.

13         Q.    So you saw the agreement after you

14    wrote this letter?

15         A.    Yes, that is correct.

16         Q.    Did you have -- did Serendip have a

17    copy of the agreement that was marked as Exhibit 4

18    at the time you wrote this letter?

19         A.    No.

20         Q.    When did you acquire a copy of the

21    agreement marked as Exhibit 4?

22         A.    When Keith Zajic sent it to me.

23         Q.    So you got it from Mr. Zajic?

24         A.    Yes.

25         Q.    When you wrote the statement on Exhibit

39

1                      FRANKLIN

2      4, on what were you basing your belief that it was

3      not licensed for digital or home video, DVD on?

4           A.    Discussions with Wendy Carlos and

5      recognizing when the contract was done.

6           Q.    I want to split those apart.  When you

7      say recognizing when the contract was done, the

8      contract was done sometime in the very early

9      '70's?

10          A.    1971.

11          Q.    Prior to the release of Clockwork

12     Orange?

13          A.    Yes.

14          Q.    Or in the general vicinity?

15          A.    The contract was done before, yes.

16          Q.    Based upon your knowledge of the movie

17     industry, you formed a belief -- well, you formed

18     a belief that home video rights would not have

19     been licensed at this time?

20          A.    I suspected that, yes.

21          Q.    So you suspected that.

22          A.    Yes.

23          Q.    Then you said discussions with

24     Ms. Carlos --

25          A.    Yes.

45

1                          FRANKLIN

2      store?

3           A.     Yes.

4                  MR. COHN:   Did they exist in 1977?

5                  MS. BURROW:   No, but shortly

6           thereafter.

7           Q.     And at no time prior to 1999 did you

8      ever see a copy of Clockwork Orange on video?

9                  MR. COHN:   Objection to the form of the

10          question.  Did you ever view it or did you

11          ever see it on sale?

12          Q.     Were you ever aware of a copy of

13     Clockwork Orange on video in any form prior to

14     1999?

15          A.     I -- no.  No -- I don't know.  I don't

16     know the answer to that.  Who knows?  I don't know

17     the answer.

18          Q.     But as of 1999 or 2000 when you first

19     learned -- I am saying 1999; it could be 2000, I

20     don't care.

21          A.     Yes.

22          Q.     You were aware that A Clockwork Orange

23     had been released on video?

24          A.     Yes.

25          Q.     But at that time did you raise an issue

46

1                          FRANKLIN

2       with Warner Brothers with respect to whether

3       Ms. Carlos had -- whether Warner Brothers had

4       licensed the home video rights to Ms. Carlos'

5       music?

6               A.      No.

7               Q.      Why not?

8               A.      Because Clockwork Orange didn't occur

9       to me at the time.

10              Q.      When did it first occur to you?

11              A.      When I wrote this letter.

12              Q.      What happened in 2007 that caused you

13      to form a belief that Ms. Carlos' music had not

14      been licensed for home video?

15              A.      It is because of the things I wrote

16      about in the second paragraph about being

17      licensed.  It is the first time I thought about it

18      from a legal standpoint, and I am talking

19      specifically about Clockwork Orange, not anything

20      else.

21              Q.      Right.  That is what we are talking

22      about now, Clockwork Orange.

23              A.      Right.

24              Q.      If you look at the amended complaint, I

25      want to focus you on paragraph 7.

67

FRANKLIN

1

2  something that hadn't been used in the movie.

3      Q.    Does the --

4      A.    It was performed out of the computer

5  actually.

6      Q.    Does the Orange Minuet --

7      A.    I think that is one of the -- it is in

8  the complaint.

9      Q.    She also played music that had been

10 composed for The Shining, correct?

11     A.    She played music that was related to

12 The Shining, yes.  Let's be careful about saying

13 what it was done for.

14     Q.    What distinction are you drawing when

15 you say it is related to The Shining?

16     A.    It is in the complaint.

17     Q.    I am asking you.  You corrected me and

18 I would like to know what you meant.

19     A.    Well, it is because -- you know, what

20 is in the documentary speaks for itself but --

21 excuse me.  It wasn't in the documentary; that is

22 the problem that got us here.

23          She did some music that had been part

24 of a demo tape that was done for The Shining.

25     Q.    Just so I am clear, in the taping

68·

1                              FRANKLIN
2       session with Mr. Harlan, Ms. Carlos played some
3       music that had been part of the demo tape for The
4       Shining?  I am just making sure I understand your
5       testimony.
6            A.    Yes.

7            Q.    I want to go back to, you said it
8       wasn't in the documentary; that is the problem
9       that got us here, or words to that effect.
10                 MR. COHN:  I don't think that is what
11            she said.  It was mumbled.
12                 MS. BURROW:  I can have it read back.
13           A.    I will tell you what I meant.  The
14      second session didn't appear in the documentary.
15           Q.    Why is that -- what did you mean when
16      you said words to the effect of that is a problem?
17           A.    Because it was used otherwise by Warner
18      Brothers.
19           Q.    That is Wendy Carlos Composer?
20           A.    Yes.
21           Q.    Staying on Life in Pictures for just a
22      second, if you go to page 10 of your complaint,
23      paragraph 36 B, you list a number of compositions
24      that were composed, arranged or performed by Wendy
25      Carlos for Clockwork Orange.

81

1                           FRANKLIN

2                   A F T E R N O O N    S E S S I O N

3                       (Time noted:  2:25 p.m.)

4                   THE VIDEOGRAPHER:  This is tape number

5           3 of the videotaped deposition of Annemarie

6           Franklin.  We are on the record at 2:25 p.m.

7    A N N E M A R I E   F R A N K L I N, resumed and

8           testified as follows:

9    CONTINUED EXAMINATION

10   BY MS. BURROW:

11          Q.    Welcome back, Ms. Franklin.

12                I think there is something you want to

13   clarify for the record.

14                MR. COHN:  You asked the question at

15          some point about who signed contracts for

16          Serendip.  Ms. Franklin made an answer which

17          in my view is two parts and which I believe

18          she clarified.  We have had an off-the-record

19          discussion in which your recollection is not

20          the same as mine.  So to that question, she

21          seeks clarification by redoing her answer.

22                MS. BURROW:  All right.

23          Q.    I will ask a couple of questions and

24   then we will make sure the record is clarified.

25                Who has authority to execute contracts

82

1                      FRANKLIN

2    on behalf of Serendip?

3              MR. COHN:   What caused the confusion

4         is, do you mean as a matter of law --

5              MS. BURROW:   No.

6              MR. COHN:   Right.   So now we get the

7         answer.

8         A.    For Serendip, I make all the

9    agreements.   For practical -- as a practical

10   matter, Wendy Carlos signs the agreements.   One

11   reason for that is I am a lawyer, so it is better

12   for her to sign it, so either one of us could sign

13   the agreement.   I, however, am the one who makes

14   all the agreements in the first place.

15        Q.    But Ms. Carlos does sign agreements on

16   behalf of Serendip?

17        A.    Yes.

18        Q.    When was the last time you spoke to Jan

19   Harlan either personally or on the phone, not in

20   writing?

21        A.    I don't think I ever spoke to him on

22   the phone.   Personally, the last time we saw him,

23   five or six years probably.   It is long after -- I

24   don't remember exactly when.

25              I definitely saw him in 2000.   I have

85

1                           FRANKLIN

2          Q.    Did you ever see Life in Pictures on

3    HBO?

4          A.    No.

5          Q.    You didn't?

6          A.    No.

7          Q.    Do you know when it was released on HBO

8    or when it was shown on HBO?

9                MR. COHN:   You mean initially?  It has

10         been played more than once.

11               MS. BURROW:   Yes.

12         Q.    When Life in Pictures was initially

13   shown on HBO.

14         A.    I don't know.

15         Q.    Do you know when Life in Pictures was

16   originally released on home video?

17         A.    I don't know.

18         Q.    Do you know if it was in 2001?

19         A.    I don't know.

20         Q.    Do you know if it was prior to the 2007

21   box set of Stanley Kubrick director series?

22         A.    I believe it was, yes, but that is just

23   from looking at information on Amazon which has

24   dates on it.

25         Q.    So Mr. Harlan came to your home on two

86

1                         FRANKLIN

2      occasions and videotaped Ms. Carlos for use in

3      Life in Pictures, correct?

4           A.    Yes.

5           Q.    When was the first time you saw Life in

6      Pictures as a finished product?

7           A.    2007.

8           Q.    During the period from 2001 to 2007,

9      did you make any attempts to see a copy of Life in

10     Pictures?

11          A.    No -- I may have seen the portion that

12     contained Wendy Carlos' appearance at some point,

13     but I don't remember when I first saw that.

14               I did not look at the whole picture

15     until, I think about 2007 or 2006.  We are talking

16     about the time frame; sometime before this was

17     written, a year probably.

18          Q.    Weren't you interested in the finished

19     product?

20               MR. COHN:  Objection.

21               Don't answer that.

22               I move that it be stricken.

23               MS. BURROW:  We will mark Exhibit 7

24          which is an e-mail dated November 18, 2006

25          from Wendy Carlos to Jan Harlan that was

87

1                           FRANKLIN

2           produced by the plaintiffs in this action and

3           is Bates numbered S 339 through S 343.

4                   (Exhibit 7, Bates numbers S 339 through

5           S 343, marked for identification, as of this

6           date.)

7           Q.     I want to focus your attention on the

8    paragraph at the bottom of the page that begins

9    eventually.  The second sentence in that paragraph

10   begins, it may be that seeing your OLM newest

11   documentary triggered taking another look at

12   SK-ALIP again as we were so pressed for time when

13   it first was shown on HBO.

14                  Do you see that?

15          A.     Yes.

16          Q.     Does that refresh your recollection as

17   to whether you ever saw it on HBO prior to 2006?

18          A.     No.

19          Q.     The next sentence says, I taped the

20   cable casts; have your VHS pre-released dubs too.

21                  Do you see that?

22          A.     Yes.

23          Q.     Does that refresh your recollection as

24   to whether Ms. Carlos had a pre-released version

25   of Stanley Kubrick:  A Life in Pictures?

88

1                       FRANKLIN

2        A.    I already said I think she may have

3   seen some of it.  Yes, I already said that.

4        Q.    Back to the complaint -- actually, I

5   want to focus on page 12, paragraph 36 I.

6              Paragraph 36 I is a portion of your

7   copyright infringement claim relating to title

8   music from A Clockwork Orange and March From A

9   Clockwork Orange and it is used in Oh, Lucky

10  Malcolm without credit or proper listing in music

11  cue sheet and publicly exhibited at film festival

12  on behalf of Warner for an admission charge.

13              Do you see that?

14       A.    Yes.

15       Q.    You would agree that the version of Oh,

16  Lucky Malcolm that is on the 2007 is a -- as an

17  extra feature in the 2007 box set release does not

18  contain any of Ms. Carlos' music; is that correct?

19       A.    That is correct.

20       Q.    So this claim arises out of the

21  exhibition of Oh, Lucky Malcolm at a film

22  festival, correct?

23       A.    Yes.

24       Q.    You learned of this claim because you

25  got a pre-released version -- or Ms. Carlos was

89

```
 1                        FRANKLIN
 2   provided a pre-released version of Oh, Lucky
 3   Malcolm by Mr. Harlan, correct?
 4        A.    Yes.
 5        Q.    Do you know when Oh, Lucky Malcolm was
 6   exhibited at a film festival?
 7        A.    In my records I do.  I don't have any
 8   my head.
 9             MR. COHN:  If you leave a space, we
10        will be glad to include it.
11   INSERT: _____.
12        Q.    Do you know if the exhibition at the
13   film festival was before or after Ms. Carlos
14   viewed a copy of Oh, Lucky Malcolm?
15        A.    I don't remember.
16        Q.    What harm has Serendip suffered as a
17   result of the exhibition of Oh, Lucky Malcolm at a
18   film festival?
19        A.    We were deprived of revenue.
20        Q.    How much revenue?
21        A.    Whatever we chose to ask for.
22        Q.    Do you know whether Ms. Carlos ever
23   acquiesced to the exhibition of Oh, Lucky Malcolm
24   at a film festival?
25             MR. COHN:  The answer to that is a yes
```

94

1                          FRANKLIN

2       between me and Jan Harlan, some of which dealt

3       with that question.

4            Q.    Are you aware of a particular

5       conversation in which Ms. Carlos rescinded her

6       acquiescence into the showing of Oh, Lucky Malcolm

7       at Traverse City Film Festival?

8            A.    Again, that question gives me -- I have

9       difficulty answering it because you're

10      characterizing her e-mail as something which I may

11      not agree with.

12           Q.    How would you characterize the

13      statements in Exhibit 8 that we just read?

14                 MR. COHN:   The statements speak for

15            themselves.   Don't characterize them.

16                 If you know of some conversation in

17            which they were amended or explained, you may

18            do that.   Your characterization of it is

19            irrelevant.

20                 If you want a ruling on that later, we

21            can mark it.

22                 MS. BURROW:   That's okay.   We will mark

23            as Exhibit 9, a document entitled composer

24            loan-out agreement dated January 25, 1980.

25                 At the same time, I will mark as

95

FRANKLIN

1
2      Exhibit 10, a one-page document also dated
3      January 25, 1980 which is executed on behalf
4      of Peregrinne and a long Dutch name and
5      Trans-Electronic Music Productions, Inc.  This
6      copy was produced as WB 000028.

7               (Exhibit 9, document entitled composer
8      loan-out agreement dated January 25, 1980,
9      marked for identification, as of this date.)
10               (Exhibit 10, WB 000028, marked for
11      identification, as of this date.)

12      Q.    Have you seen the document marked as
13   Exhibit 9 before?
14      A.    Yes.
15      Q.    When did you first see this document?
16      A.    I don't know.  I don't remember.
17      Q.    This document is dated January 25,
18   1980, correct?
19      A.    Yes.
20      Q.    You testified earlier that you formed
21   Serendip in 1980?
22      A.    Yes.
23      Q.    Was Serendip formed before or after
24   January 25, 1980?
25      A.    I don't remember.

96

1                           FRANKLIN

2          Q.    But the contracting entity here is

3     TEMPI, correct?

4          A.    Yes.    There is no argument about that.

5          Q.    Did you have any role in negotiating

6     the agreement that has been marked as Exhibit 9?

7          A.    No.

8          Q.    Did you discuss with Ms. Carlos at the

9     time anything about the agreement that is marked

10    as Exhibit 9?

11         A.    At the time?

12         Q.    Yes.

13         A.    Which time?

14         Q.    In 1980.   On or before January 25,

15    1980.

16         A.    On or before January 25, 1980,

17    absolutely not.

18         Q.    Why are you so certain?

19         A.    Well, because I had nothing to do with

20    negotiations or the formation of that contract.

21         Q.    But you knew Ms. Carlos then?

22         A.    Yes, I did.

23         Q.    But you didn't discuss this agreement

24    with her?

25               MR. COHN:    That is what she said.

97

1                          FRANKLIN

2               MS. BURROW:  I am just clarifying, Mr.

3          Cohn.

4               MR. COHN:  Well, the form is

5          adversarial.  She said she didn't.  I don't

6          know what needs clarification.

7          Q.    I am actually going to ask for an

8     answer.

9          A.    I don't remember the question now.

10         Q.    I was just confirming although you knew

11    Ms. Carlos then, you didn't discuss this agreement

12    with her at the time?

13         A.    At what time, please?

14         Q.    On or before January 25, 1980.

15         A.    This agreement, no because I hadn't

16    seen it before January 25, 1980.

17         Q.    If I ask you the same set of questions

18    with respect to Exhibit 10 -- you recognize

19    Exhibit 10?

20         A.    Yes.

21         Q.    You have seen it before?

22         A.    Yes.

23         Q.    Did you have any role in negotiating

24    Exhibit 10?

25         A.    No.

102

```
1                         FRANKLIN
2               THE WITNESS:  Would you read back the
3          previous question.
4               (Record read.)
5          A.    In the making.
6          Q.    The Valse Triste that is at issue in
7     this case is an arrangement of a work by Sibelius,
8     correct?
9          A.    Yes.
10         Q.    Did Ms. Carlos obtain a license to
11    arrange the Sibelius work?
12         A.    No.
13         Q.    Did TEMPI, to your knowledge, obtain a
14    license to arrange the Sibelius work?
15         A.    No.
16         Q.    Did Serendip ever obtain a license to
17    arrange the Sibelius work?
18         A.    No.
19         Q.    Did you at any time undertake an
20    investigation as to whether the Sibelius work was
21    still under copyright at the time that Valse
22    Triste was delivered to Mr. Kubrick?
23         A.    Would you repeat the question?
24         Q.    Certainly.
25               Sometime between 1978 and 1980,
```

107

1                        FRANKLIN

2    release, one of the video releases, of which there

3    had been multiple releases of Kubrick stuff.

4              You asked me what did I do after that?

5    That is not the only thing I did after that.

6              MS. BURROW:   I will mark as Exhibit 11,

7         a document that appears to be an e-mail

8         exchange in July 1999 between Vivian Kubrick

9         and Wendy Carlos that was produced as S

10        0000203 through 205.

11             (Exhibit 11, S 0000203 through 205,

12        marked for identification, as of this date.)

13        Q.   Do you recall seeing this e-mail

14   previously?

15        A.   Yes.   I am the one who produced these

16   for you.

17        Q.   I really, actually just provided this

18   to you for purposes of setting the dates.

19        A.   Right.

20        Q.   I don't have any specific questions

21   about that e-mail at this time.

22             MS. BURROW:   Exhibit 12 is an e-mail

23        exchange between Ms. Kubrick and Ms. Carlos

24        that appears to be from 2001.

25             (Exhibit 12, e-mail exchange between

108

1                        FRANKLIN

2         Ms. Kubrick and Ms. Carlos from 2001, marked

3         for identification, as of this date.)

4         A.     Right.

5         Q.     That was produced as S 366.  Do you see

6    that?

7         A.     Yes.

8         Q.     This was a less little than two years

9    after the 1999 e-mail we just looked at?

10        A.     Yes.

11        Q.     In that e-mail, Ms. Carlos is

12   requesting the original recording of the Valse

13   Triste because the music at the end of her

14   documentary is breaking up?

15        A.     Yes.

16        Q.     Did Ms. Carlos provide that music?

17        A.     I believe she did.

18             MS. BURROW:  I will give you what we

19        will mark as Exhibit 13.

20             (Exhibit 13, S 000211 and 212, marked

21        for identification, as of this date.)

22             MS. BURROW:  Exhibit 13 is an e-mail

23        dated February 15, 2001.  It appears it is

24        from Ms. Carlos to Ms. Kubrick.  It was

25        produced as S 000211 and 212.

109

1                            FRANKLIN
2          Q.    Did you ever discuss with Ms. Carlos --
3     I don't want a privileged conversation.
4                 MR. COHN:   Do me a small favor, since I
5          am sure your presumption is correct, but could
6          you ask if this is, in fact, from Wendy Carlos
7          to --
8                 MS. BURROW:   Sure.
9                 MR. COHN:   Just so the record is clear
10         and your presumption, while it is of great
11         value to me personally, I am not sure in the
12         courtroom it means much.
13                MS. BURROW:   That is fine.
14         Q.    Can you review this document and let me
15    know whether this is an e-mail from -- really an
16    e-mail exchange between Ms. Kubrick and
17    Ms. Carlos?
18         A.    It appears to be, yes.
19         Q.    In fact, the L/W on page 212 in the
20    middle of the page, do you know whether Ms. Carlos
21    concludes e-mails that way?
22         A.    She sometimes does.
23         Q.    Do you know why Ms. Carlos complied
24    with Ms. Kubrick's request to provide music for
25    her to incorporate into her documentary in 2001?

110

1                          FRANKLIN

2          A.    That is a question I can't answer the

3    way it is phrased.

4          Q.    Ms. Carlos did comply with

5    Ms. Kubrick's request, did she not?

6          A.    She provided a better version of the

7    music, yes.

8          Q.    Nowhere in this document is there any

9    indication that there is a restriction on

10   Ms. Kubrick's ability to use that music in the

11   documentary, correct?

12         A.    In this particular e-mail, there might

13   not be.  I haven't read the e-mail, so I can't

14   tell you.  The document speaks for itself.

15         Q.    Ms. Carlos is a member of Serendip,

16   correct?

17         A.    Yes, she is.

18               MS. BURROW:   Exhibit 14 will be a

19         document Bates labeled S 000220.

20               (Exhibit 14, Bates S 000220, marked for

21         identification, as of this date.)

22         Q.    Do you recognize this document?

23         A.    Yes.

24         Q.    In fact, did you write the portion at

25   the bottom of the page?

111

FRANKLIN

1

2      A.    Yes.

3      Q.    The portion at the bottom says, the

4  music credit for the music by Wendy Carlos used in

5  The Making of The Shining documentary should have

6  read something like this?

7      A.    Yes.

8      Q.    Then it provides a copyright notice,

9  correct?

10     A.    Yes.

11     Q.    Did you as of February 16, 2001 have

12  any understanding of where -- how the Making of

13  the Shining was to be distributed?

14     A.    It is for purposes of video.

15     Q.    You instructed Ms. Kubrick and Ned

16  Price to add this music credit to the documentary,

17  correct?

18     A.    The e-mail is addressed to Vivian

19  Kubrick with a copy to Ned Price.

20     Q.    In February of 2001, did you have an

21  understanding of who Ned Price was?

22     A.    No.

23     Q.    Where did you get Mr. Price's name?

24     A.    I think it is from another e-mail.

25     Q.    Why did you want this music credit at

118

1                           FRANKLIN

2          Q.     Do you know if Ms. Carlos had any
3     conversations about any specific pieces of music
4     with Mr. Kubrick prior to the delivery of that
5     demonstration tape?
6          A.     There was one conversation that
7     involved music which influenced what was on the
8     demonstration tape.
9          Q.     In fact, is it your understanding that
10    Valse Triste was mentioned expressly in that
11    conversation?
12         A.     It was mentioned in the conversation.
13         Q.     By Mr. Kubrick?
14         A.     In response to a question from Rachel
15    Elkind and Wendy Carlos, yes.
16         Q.     What do you understand that question to
17    be?
18         A.     What are you listening to, Stanley?
19         Q.     What else do you know about that
20    conversation?
21         A.     Well, I wasn't present.
22         Q.     Understood.
23         A.     But the --
24                MR. COHN:   Wait --
25         A.     That is it.

122

1                    FRANKLIN

2           The conversation they had with him was

3    totally unproductive because he didn't know what

4    he wanted and he told them to read the book and

5    they had already read the book.  So they were left

6    with the book as the only guidance, Steven King's

7    novel.

8           At the end of the conversation, in

9    frustration, one of -- Ms. Carlos or Ms. Elkind,

10   probably Ms. Elkind, asked him, so Stanley, what

11   are you listening to; can you tell us that and he

12   said Sibelius' Valse Triste, and that then led

13   Wendy Carlos to do an arrangement of Valse Triste

14   that was included on the first demonstration tape

15   that was sent to Stanley Kubrick.

16       Q.    Just for the record, it is Serendip's

17   position that Serendip owns the copyright in the

18   music on that demonstration tape?

19       A.    Yes.

20       Q.    And that Warner Brothers does not have

21   the rights to distribute the music on that

22   demonstration tape?

23       A.    They do not.

24           MR. COHN:  The music that was on the

25       demonstration tape.  It is no longer -- they

135

1                    FRANKLIN

2          A.    Keith Zajic sent them to me.

3          Q.    I want to turn to the complaint and you

4    look at the paragraph 37 on page 12.

5               You see where it says, Serendip

6    notified Warner prior to the release of the 2007

7    Stanley Kubrick, Warner home video director

8    series, home video set, as well as the release of

9    the individual titles contained in that set that

10   unlicensed use of Wendy Carlos' music therein

11   would infringe Serendip's copyright, but Warner

12   refused to cease its acts.

13              Do you see that?

14         A.    I see that.

15         Q.    Does that paragraph refer to your

16   September 24, 2000 letter that we marked earlier?

17         A.    Yes --

18              MR. COHN:   Clarification.   Does it

19         refer to solely that letter?

20              MS. BURROW:   That is the next question.

21         Q.    Prior to your September 24, 2007

22   letter, did Serendip notify Warner that Serendip

23   believed that the 2007 box set or any of the

24   titles contained in that set would infringe

25   Serendip's copyrights?

1                       FRANKLIN

2          A.    That is the first time we sent a notice

3     to Warner Brothers.

4          Q.    Paragraphs 41 and 42 in the

5     complaint -- actually through 43 contain

6     allegations relating to Ms. Carlos' agreement to

7     be videotaped for purposes of Life in Pictures,

8     correct?

9          A.    Yes.

10         Q.    The subsequent use of some of that

11    video in Wendy Carlos Composer?

12         A.    That is correct.

13         Q.    I want to be clear there is not a claim

14    in this lawsuit arising out of the use of

15    Ms. Carlos' interview in Life in Pictures,

16    correct?

17         A.    No.

18               MR. COHN:  Yes, that is correct?

19         Q.    Yes, that is correct.  No, there is not

20    an allegation.

21         A.    What you just said, yes.

22               MR. COHN:  Sorry.

23               MS. BURROW:  I appreciate it.

24               THE VIDEOGRAPHER:  We are now off the

25          record at 4:17 p.m.

174

1               A C K N O W L E D G M E N T

2

3    STATE OF              )

4                          )  ss.:

5    COUNTY OF             )

6

7               I, ANNEMARIE FRANKLIN, hereby

8    certify that I have read the transcript of my

9    testimony taken under oath in my deposition;

10   that the transcript is a true, complete and

11   correct record of my testimony, and that the

12   answers on the record as given by me are true

13   and correct.

14

15            _____

16                    ANNEMARIE  FRANKLIN

17

18   Signed and subscribed to before
     me, this      day of           ,
19   20__.

20

21   _____

22   Notary Public, State of _____

23

24

25

175

```
 1                  C E R T I F I C A T E

 2

 3    STATE OF NEW YORK      )

 4                           ss:

 5    COUNTY OF NEW YORK     )

 6

 7            I, BARBARA DRISCOLL, a Shorthand

 8    Reporter and a Notary Public within and for the

 9    State of New York, do hereby certify that the

10    foregoing deposition of ANNEMARIE FRANKLIN was

11    taken before me on the 16th day of September, 2009;

12            That the said witness was duly sworn

13    before the commencement of her testimony; that the

14    said testimony was taken stenographically by me and

15    then transcribed.

16            I further certify that I am not related

17    by blood or marriage to any of the parties to this

18    action or interested directly or indirectly in the

19    matter in controversy; nor am I in the employ of

20    any of the counsel in this action.

21            IN WITNESS WHEREOF, I have hereunto set

22    my hand this 29th day of September, 2009.

23

24                        Barbara Driscoll

25                        BARBARA DRISCOLL
```