**Annemarie Franklin, Esq.** (CA Bar No. 150734)
E-mail: af102@nyc.rr.com
830 Broadway
P.O. Box 1024 Cooper Station
New York, NY 10276-1024
212-475-1630

8852 Sandpiper Circle
Fountain Valley, CA 92708
917-686-7420

**Frederick H. Cohn**
E-mail: fcohn@frederickhcohn.com
61 Broadway, Suite 1601
New York, NY 10006
212-768-1110

Attorneys for Plaintiffs and Counter-Defendants

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERENDIP LLC & WENDY CARLOS,<br><br>Plaintiffs,<br>v.<br><br>WARNER BROS. ENTERTAINMENT INC.,<br><br>Defendant.<br><br>WARNER BROS. ENTERTAINMENT INC.,<br><br>Counter-Claimant,<br>v.<br>SERENDIP LLC & WENDY CARLOS,<br><br>Counter-Defendants. | CASE NO. CV 08-07739 RGK (RCx)<br><br>The Honorable R. Gary Klausner<br><br>**DECLARATION OF WENDY CARLOS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Fed.R.Civ.P.56**<br><br>Date: November 30, 2009<br>Time: 9:00 a.m.<br>Place: Courtroom 850<br>　　　255 E. Temple St.<br>　　　Los Angeles, CA |

**DECLARATION OF WENDY CARLOS**

I, Wendy Carlos, hereby state and declare as follows:

1. I am a member of Plaintiff Serendip LLC ("Serendip") and also an individual Plaintiff. I make this Declaration in support of Plaintiffs' motion for partial summary judgment, in addition to the facts I set out in the Verified Amended Complaint. The facts set forth in this Declaration are true to my own knowledge and, if called as a witness, I could and would testify competently about the matters set forth in this Declaration.

2. I began piano lessons at age 6 and won a Westinghouse Science Fair scholarship for a home built computer at age 16. I pursued a hybrid major in music and physics for my degree at Brown University, where I studied music theory under the well-known conductor Eric Kunzel. I earned an M.A. in music composition from Columbia University, studying with pioneers Otto Luening, Milton Babbit and Vladimir Ussachevsky at the first electronic music center in the U.S.A. During this time, I assisted Usssachevsky with a live dramatic musical presentation of the play "No Exit," featuring Viveca Lindfors, and I collaborated with legendary French composer Edgar Varese, working on stage in a New York Philharmonic concert series conducted by Leonard Bernstein.

3. Upon graduation, I worked as a recording engineer and met Robert Moog, becoming one of his first clients and consultants in the development of his synthesizer. In collaboration with Rachel Elkind, who was the producer of my music for a dozen years, my 1968 recording, "Switched-On Bach," achieved platinum sales status, bringing the Moog synthesizer into the public consciousness and winning three Grammy Awards. We refined our techniques in "The Well-Tempered Synthesizer," which lead to a live demonstration of the synthesizer on stage with Leonard Slatkin conducting the St. Louis Symphony Orchestra. We also composed and recorded music for several live stage productions, working with Irene Pappas in a Broadway production of "Medea."

4. Following my work in connection with "A Clockwork Orange" and "The Shining," which is the subject of this action, I composed the score for the 1982 Disney CGI film, "Tron." For that score, I composed music for large symphonic orchestra and chorus, merged in a continuous blend with synthesizers, which later became a common combination. In 1984, my album, "Digital Moonscapes," introduced what I called the "LSI Philharmonic Orchestra," a replica of orchestral timbres virtually indistinguishable from their acoustic instrumental counterparts. At this time, I also composed a concerto for string quartet and orchestra, conducted by Kent Nagano with the Kronos Quartet. Nagano also conducted orchestral performances of my music from "Digital Moonscapes" by the symphonies in Berkeley and Boston.

5. I later worked with alternate scales and musical tunings, combining music from old world cultures with new classical works, and collaborated with (Weird) Al Yankovic on a humorous musical album, coupling a parody of Prokofiev's "Peter and the Wolf" with a new composition in the spirit of the Saint-Saens classic, "Carnival of the Animals – Part Two."

6. Over the years, I have been a member of professional organizations, including the Audio Engineering Society and the National Academy of Recording Arts and Sciences, consulted for music software developers, designed PostScript music fonts and developed libraries and tunings for synthesizer manufacturers.

7. In 2005, the Society for Electro-Acoustic Music in the United States presented me the SEAMUS Life Achievement Award in recognition of my "longstanding dedication and meritorious contributions to the field of eclectro-acoustic music."

8. Electro-acoustic Music ("EAMusic"), its focus, motivation and reason for success, has been concerned with new sounds, new expressive timbres, and their blending in novel ways, more than just traditional melody, harmony and rhythm. The latter properties may still be employed, often importantly featured,

as EAMusic has developed into a "superset" of earlier music, encompassing both old and new, a means of expression that extends beyond historical practices.

9. That explains why many of us adopted EAMusic, to explore past the established bounds and limits. I was part of the pioneering movement from the 50s through the 80s that defined and expanded the field, and tried to provide a common language for the new medium. We trace our roots back to the early 20th century. But the public's attention lagged until the late 60s, when recorded works, notably my "Switched-On Bach," appeared, and introduced the modern synthesizer. By the 21st century, EAMusic has become the dominant music-making and creative recording medium, used by home enthusiasts working in bedrooms and garages, rock stars, film composers, and professional composers in all genres of music making.

10. Prior to 1978, the U.S. Copyright Office required a traditional visible printed score for copyright registration. EAMusic composers like me were forced to extend traditional music notation, adding graphic and textural elements that would suggest (as far as possible) the content and musical expression of each new musical work. During the '60s this compromise grew into a quite comprehensive documentation..

11. Two of my original works, "Title Music from A Clockwork Orange," and "Beethoviana" embody a long established practice called "theme and variation." They are in fact variations on a theme by Henry Purcell ("March for the Funeral of Queen Mary," written in 1695). Purcell's brief existing score provided the starting point, a kind of musical skeleton for both final works, which are otherwise completely original EAMusic compositions, arrangements, and orchestrations. Thus, the two pieces follow the traditions of many such esteemed works as: Brahms's "Variations on a Theme by Haydn" and Rachmaninoff's "Rhapsody on a Theme by Paganini."

12. Significantly, if the Purcell theme were "whited-out", i.e., removed from the final scores, the remaining music is so extensive and detailed that each would remain a self-standing original composition. That completeness didn't just happen. It required hours of careful planning and notation; nothing was improvised. (On the Moog Synthesizer, improvisation was impossible anyway, with its clumsy one-note-at-a-time, one-line-at-a-time interface, no memory, no presets, unstable pitch and settings. Every sound/timbre had to be created anew from scratch, and nothing was automatic, despite popular misconceptions.)

13. "Title Music from CO" and "Beethoviana" were composed in 1971, with written out scores, used during the compositional organizing and later for copyright registration purposes. These documents can easily be studied, or even (in the hands of a skilled electronic musician/performer) given a new electronic "realization" which would follow the major features and expressions of the original pieces, timbre by timbre, and note by note, much as traditional scores are performed regularly on stage and in new recordings.

14. A basic "lead-sheet" cannot capture the depth and unique features of either of these works. One might, for example, strip-out the "Purcell skeleton" into a written lead-sheet (after all, that's what I began with). But in so doing would leave out "all the meat" -- more than two-thirds of the final features that most listeners immediately respond to, which have given them their "iconic" status.

15. One cannot capture (nor analyze the essentials of) EAMusic using simple melodic/harmonic/rhythmic notation. It misses the point, and most of the music, and is the reason composers of my generation had to extend the crucial notational expressions. Major importance in EAMusic is placed on the actual final sounds and their expression, be they sampled ("musique concrète"), generated by synthesis, or otherwise. Together with the assembly, layering and mixing of

elements into an acoustic, musical soundfield for the final pieces, these extend well beyond the limits of a traditional score, what it can reproduce or suggest.

16. What Stanley Kubrick sought from me was very different from what he could have gotten from nearly any other musician of the time. He became fascinated by the unique qualities that I was able to provide using the then new EAMusic tools, a fascination that his audiences since have shared enthusiastically. He wanted more than another generic re-arrangement of the Purcell theme (which tend to sound surprisingly alike), and in fact replaced such a recording with my composition/arrangement. The many subtle techniques and expressions are what make these pieces so recognizable and distinctive even now.

17. Attached as Exhibit A are true copies of the working scores for "Title Music From A Clockwork Orange," and "Theme From A Clockwork Orange" (Beethoviana), as submitted to the U.S. Copyright Office for registration of the copyrights.

18. Attached as Exhibit B are true copies of the copyright registration certificates applicable to the various works I composed or arranged and recorded in connection with "A Clockwork Orange," in addition to those attached to the complaint, and the document whereby ownership of the copyrights was transferred to Serendip.

19. In 1978, after we had heard through a third party that Stanley Kubrick's next motion picture project was to be based upon Stephen King's novel "The Shining," Rachel Elkind and I each read the book and eventually had one brief telephone conversation of less than ten minutes with Kubrick. During this conversation, Kubrick was unforthcoming and noncommittal about his project or its status. He gave us no guidance, he did not commission any music, we made no agreement, we discussed no terms, he did not ask us to do anything, he did not promise to do anything and neither did Rachel Elkind and I.

20. As further spelled out in Paragraph 9 of the complaint, Rachel Elkind and I elected to prepare demonstration music at our own expense and selection and sent it to Kubrick. We heard nothing for months until Jan Harlan contacted us at the end of 1978 and asked to meet.

21. At that meeting in New York, Harlan informed Rachel Elkind and me that they wished to use one composition from a demonstration tape in the theatrical trailer to be exhibited beginning about a year before the currently scheduled release date of "The Shining" at the end of 1979. We provided a reproduction quality copy of the master recording after which we were paid $1000. No agreement was discussed and no commitment was made to retain us as composers for the soundtrack. At some time in early 1979, we viewed the trailer containing our composition "Clockworks" at a theater in New York.

22. Attached as Exhibit C are true copies of the "Letter Agreement" and the "Composers Loanout Agreement" dated January 25, 1980.

23. Attached as Exhibit D are true copies of Warner's applications for registration of copyright for "Clockworks" and "Nocturnal Valse Triste."

24. Attached as Exhibit E is a true copy of the certificate of incorporation for Warner Bros. Entertainment Inc.

25. Attached as Exhibit F is a true copy of the music credits in the video feature "Great Bolshy Yarblokos!: Making A Clockwork Orange," distributed by Warner, using my name without my consent in connection with music composed, arranged and performed by other persons.

26. Attached as Exhibit G are true copies of the e-mail communications whereby Jan Harlan asked for my consent for the video feature "Wendy Carlos, Composer" and I declined

27. I have never conducted the business of "offering for sale, selling, advertising, and distributing compact discs and/or other products," nor does Serendip actually conduct that business.

28. The "Title Music" cue containing the "Dies Irae" was the last cue that I recorded for "The Shining." The album "Rediscovering Lost Scores" does not contain the same music cue, nor the version of the music cue entitled "Rocky Mountains" which appears in "The Shining."

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

November 4, 2009
at New York, NY

_____
**Wendy Carlos**