CALDWELL LESLIE & PROCTOR, PC
CHRISTOPHER G. CALDWELL, SBN 106790
Email: caldwell@caldwell-leslie.com
LINDA M. BURROW, SBN 194668
Email: burrow@caldwell-leslie.com
TINA WONG, SBN 250214
Email: wong@caldwell-leslie.com
1000 Wilshire Blvd., Suite 600
Los Angeles, California 90017-2463
Telephone (213) 629-9040
Facsimile (213) 629-9022

Attorneys for Defendant and Counter-claimant
WARNER BROS. ENTERTAINMENT INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERENDIP LLC & WENDY CARLOS,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>WARNER BROS. ENTERTAINMENT INC.,<br><br>　　　　Defendant. | CASE NO. CV 08-07739 RGK (RCx)<br><br>**DECLARATION OF EDWARD PIERSON IN SUPPORT OF WARNER BROS. ENTERTAINMENT INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| WARNER BROS. ENTERTAINMENT INC.<br><br>　　　　Counter-claimant,<br><br>v.<br><br>SERENDIP LLC, a New York limited liability company, and WENDY CARLOS, an individual,<br><br>　　　　Counter-defendants | [Defendant Warner Bros. Entertainment Inc.'s Opposition to Plaintiffs' Motion for Partial Summary Judgment; Statement of Genuine Issues of Fact and Additional Material Facts; Evidentiary Objections; Declaration of Linda M. Burrow and Exhibits Thereto filed concurrently herewith]<br><br>[[Proposed] Order Denying Plaintiffs' Motion for Partial Summary Judgment lodged concurrently herewith]<br><br>Date:　　　November 30, 2009<br>Time:　　　9:00 a.m.<br>Courtroom:　850 |

# DECLARATION OF EDWARD PIERSON

I, Edward Pierson, declare and state:

1. I am currently Adjunct Professor of Law at Southwestern Law School in Los Angeles California, where I have taught the course "Entertainment Law" for the past 18 years. I also serve on the School's Entertainment and Law Institute's International Advisory Board. I have been retained by Warner Bros. Entertainment, Inc. as an expert witness in this action. I make this declaration based upon my personal knowledge and expertise. If called to testify, I could and will testify competently thereto.

2. I am co-author of the casebook "Law and Business of the Entertainment Industries", widely used in law schools across the country and published in its Fifth Edition by Praeger Publishers. I began co-authoring this casebook over twenty years ago. The casebook covers Music Publishing, Recorded Music and Film among other topics.

3. I was the Executive Vice President, Legal and Business Affairs and General Counsel of Warner/Chappell Music from 2000 to 2008 in a role that expanded my duties as the chief legal counsel of the music publishing company I joined in 1989 and worked in the Legal and Business Affairs department for 19 years. In my position as General Counsel, I oversaw all aspects of the company's legal affairs (drafting of agreements, overseeing of claims, licensing agreement forms and settlement of licensing claims, worldwide copyright enforcement and litigation matters) as well as the company's business affairs (contract formulation, negotiation and administration). In the course of my work at Warner/Chappell, I handled major negotiations for music publishing rights with film studios including Warner Bros, New Line Cinema and Lucasfilm , as well as videogame companies including Microsoft, which included review and knowledge of composer, synchronization and music license agreements for numerous films, TV programs and games including the John Williams composed Star Wars and

"Indiana Jones" soundtracks, the "Lord of the Rings" soundtracks and the "Halo" and "Fable" game soundtracks.

4. In October 2008, I received The American Bar Association Forum on the Entertainment and Sports Industries' Ed Rubin Service Award for exemplary service and leadership at its annual meeting. I have served as the Chairperson of the American Bar Association Forum Committee on the Entertainment and Sports Industries and was also the Chair of its Music and Personal Appearances Division.

5. I opened a private law practice in 1978 specializing in entertainment and intellectual property law in Denver, Colorado and practiced there until 1989. A Phi Beta Kappa honor graduate of the University of Denver (BA, 1975), I earned my law degree from the University Of Denver College Of Law (JD, 1977) and I am an active member of the Colorado Bar. Prior to 1989, I was an Assistant Adjunct Professor of Law at the University Of Denver College Of Law where I also taught Entertainment Law.

6. Presently, I am a consultant in the music and video game industry and over the past twelve months my client list has included a major technology company that retained my services to advise them on music licensing issues. My non-disclosure agreement with such company prevents me from revealing further details.

7. In preparation for this assignment I was provided with and read the Verified Amended Complaint (the "Complaint") filed in the United States District Court for the Central District of California, titled Serendip LLC & Wendy Carlos vs. Warner Bros Entertainment Inc., an Agreement pertaining to music for "A Clockwork Orange" dated June 1, 1971 attached as Exhibit A to the Complaint, a Composer Loanout Agreement and side letter dated January 25, 1980 in respect of music in "The Shining" ("Composer Agreement"), six (6) Synchronization and Master License Agreements from 2006 to 2009 in which

Serendip was the licensor and a copy of the Stanley Kubrick Directors' Series box set that includes the films in questions. Prior to this engagement, I had owned a copy of "Switched-On Bach" and have seen both "A Clockwork Orange" and "The Shining" and was unaware of any matters in dispute or discussion between the Plaintiff and Defendant until I read the aforementioned Complaint.

8. The introductory paragraphs and subsequent provisions of the Clockwork Orange Agreement evidence an agreement that was not a common form as alleged in Paragraph 7 of the Complaint. This Agreement combined a synchronization license, a master use license agreement and a soundtrack royalty agreement for an artist for compositions that were new original works as well as performances and arrangements of public domain works (e.g. Beethoven's Ninth Symphony"). Based upon my knowledge and experience of licensing agreements for music entered into during this time, the many agreements which were intended to include so-called "new media" rights did so by adding language to the grant of rights clause stating rights also included distribution and uses by "methods now or later known" or in "all media now or hereinafter devised".

9. Further in respect of the introductory paragraphs on page 1 of the Agreement, I believe the reference to "sound track" in paragraph 2 on page 1 is intended to include within its scope and encompass all uses in (and in connection with) the Photoplay (as distinguished from what is known as a "sound track recordings" referenced and referred to later in the Agreement and defined as "Albums" in Paragraph 6).

10. In respect of Paragraph 2 of the Agreement, which is the primary grant of rights clause, I believe Licensor granted to Licensee broad and extended rights by the specific language of such Paragraph 2. In particular the last 47 words: "and furthermore the unqualified and unrestricted right to publicly perform the same everywhere, for profit or otherwise <u>and</u> by all means and

-3-

methods now or later known, free of any obligation to pay any fees of any kind to Walter Carlos or any other person or corporation". I believe the use and inclusion of "and" in the phrase "and by all means and methods now or later known" clearly evidences the intent of the parties to include all "methods" then or later known and not limited to public performance rights. Expansion of rights to new methods and new media by such language is and has been an expansion of the synchronization rights as opposed to expansion of performance rights. This opinion is based on my extensive experience reviewing and drafting many licenses for the past 30 years. Further, had the parties intended to restrict all new media rights in the grant, as some agreements then and now provide, it would have been accomplished by omitting the phrase "and furthermore the unqualified and unrestricted right to publicly perform the same everywhere, for profit or otherwise *and* by all means and methods now or later known, free of any obligation to pay any fees of any kind to Walter Carlos or any other person or corporation". Inclusion of this provision, in my opinion was not intended in any way to be limited to performance rights. Rather it was intended and included to extend to all prior rights granted including the synchronization right.

      11. In respect of Paragraph 6 of the Agreement, I do not accept or agree with the Plaintiff's claim that sale of home video copies comes within the scope of sale of Albums for which Album Royalties should be paid under Paragraph 8 of the Agreement. This royalty was clearly intended to include and was limited to "so called long-playing sound track recordings (hereinafter referred to as "Albums") of the music in the score of the Photoplay" and clearly not the Photoplay in a home video, DVD or any other format. In addition, the royalty obligation in Paragraph 8 (b) of the Agreement was clear as to its scope "for and on account of the exploitation in the form of albums" Moreover, the royalty provisions of Paragraph 8 are clearly customary phonorecord royalty provisions and it has not been industry custom, expectation or practice to pay so-called

phonorecord or Album Royalties to a composer or artist on video, DVD or downloaded copies of a film. A "long-playing sound track Album" is the scope of the royalty obligation in the Agreement and very different from the film with music embodied in it and distributed by other methods.

12. In my experience in the Legal and Business Affairs Department of Warner/Chappell Music from 1989 to 2008, I have had substantial and extensive personal experience in the arena of amending music license agreements to provide for additional grants of rights to the licensee and pay additional fees to the licensor. Historically such arrangements are often the result of new technologies that may have not been contemplated at the time original rights were secured.

13. The common drafting protection to address this situation which licensees sought to include in their agreements was to include, in the grant of rights the phrase "in all media now known or hereafter devised" or similar language. It is my opinion that the phrase in this 1971 agreement "by all means and methods now or later known" in the grant of rights is significant, and indicative of the intent of the parties then that no additional fees be paid for delivery of the film by a new method (e.g. home video, DVD or internet).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 13 day of November, 2009 at Los Angeles, California

_____
Edward Pierson

-5-