**Annemarie Franklin, Esq.** (CA Bar No. 150734)
E-mail: af102@nyc.rr.com
830 Broadway
P.O. Box 1024 Cooper Station
New York, NY 10276-1024
212-475-1630

8852 Sandpiper Circle
Fountain Valley, CA 92708
917-686-7420

**Frederick H. Cohn**
E-mail: fcohn@frederickhcohn.com
61 Broadway, Suite 1601
New York, NY 10006
212-768-1110

Attorneys for Plaintiffs and Counter-Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERENDIP LLC & WENDY CARLOS, | CASE NO. CV 08-07739 RGK (RCx) |
| Plaintiffs, | The Honorable R. Gary Klausner |
| v. | |
| WARNER BROS. ENTERTAINMENT INC., | **PLAINTIFFS' NOTICE OF MOTION AND MOTION *IN LIMINE*** |
| Defendant. | |
| WARNER BROS. ENTERTAINMENT INC., | Date:  January 19, 2010 |
| Counter-Claimant, | Time: 9:00 a.m. |
| v. | Place: Courtroom 850 |
| SERENDIP LLC & WENDY CARLOS, | 255 E. Temple St. |
| Counter-Defendants. | Los Angeles, CA |

1 | TO DEFENDANT AND ATTORNEYS OF RECORD:

2 |      PLEASE TAKE NOTICE that on January 19, 2010 at 9:00 a.m. in the
3 | Courtroom of the Hon. R. Gary Klausner of the above-referenced Court, located
4 | at 255 East Temple Street, Los Angeles, CA, plaintiffs will move for rulings *in*
5 | *limine* addressed to the trial of this matter as follows:

6 | 1.    Declaring that the defendant's expert, Edward Pierson, not be permitted to
7 | testify other than as to the measure of damages in response to the plaintiff's
8 | damages expert.

9 | 2.    Forbidding the defendant to refer to the plaintiff, Wendy Carlos, as Walter
10 | Carlos, which ruling shall include historical references to Ms. Carlos at the time
11 | she was known as Walter Carlos.

12 |      This motion is made following telephone conference with opposing counsel
13 | pursuant to Local Rule 7-3 on November 13, 2009.

14 |      This motion is based upon this notice of motion, the attached declaration of
15 | Frederick H. Cohn, and exhibits thereto, the accompanying Memorandum of
16 | Points and Authorities, all pleadings and papers on file in this action, and upon
17 | such other matters as may be presented to the Court at the time of the hearing.

18 |

19 | Dated: December 4, 2009              Respectfully submitted,

20 |

21 |

22 |

23 |                        Frederick H. Cohn
24 |                        Attorney for Plaintiffs and
                       Counter-Defendants
25 |                        Serendip LLC & Wendy Carlos

26 |

27 |

28 |

-1-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DECLARATION OF FREDERICK H. COHN**

Frederick H. Cohn, an attorney admitted *pro haec vice* in this case, declares and states as follows:

1. I am trial counsel in the above entitled matter. I make this declaration in support of our motion *in limine* seeking relief on two matters.

2. This litigation, although it has multiple causes of action, largely hinges on construction of a contract entered into on or about June 1, 1971 between predecessors of the plaintiff (Serendip) and the defendant (Warner Bros.). It is this contract which gives rise to both applications for relief. The first is to forbid testimony by Edward Pierson whom the defense seeks to have opine on the meaning of the contract in question. (Pierson's declaration submitted in the defendant's opposition to the plaintiff's motion for summary judgement is attached as Exhibit B).

3. Plaintiff opposes his testimony for the reasons set forth in the memorandum of law which is filed concurrently.

4. Secondly we seek to prevent a nascent appeal to prejudice. One of the plaintiffs is Wendy Carlos. She sues individually and is a member of Serendip. She is referred to in Exhibit A (Page 1, Page 8 paragraph 16) and is a signatory to the agreement *sub nom* Walter Carlos.

5. Ms. Carlos was transgendered. She has been known, professionally and in her private life as Wendy Carlos for decades. There was no deception in the

1  change of her name and her former gender and name are known throughout the

2  music and film industry.

3
4  6. Out of concern that jurors might have a bias against Ms. Carlos' lifestyle or

5  the choices that her name change indicate that she made, I requested that

6  defendants forego reference to Walter Carlos in the trial. Counsel has indicated

7
8  to me that there would be no such forbearance. A copy of the e-mail from Linda

9  Burrow to me in that regard is included as Exhibit C.

10
11  7.   We respectfully suggest that the Court not permit reference to Walter

12  Carlos. (See memorandum of law, Point II).

13
14       I declare under penalty of perjury under the laws of the United States of

15  America that the foregoing is true and correct. Executed this 3rd day of

16  December, 2009 at New York, New York.

17
18
19
20                                          Frederick H. Cohn
21                                          Attorney for the plaintiffs
                                            Serendip, LLC and
22                                          Wendy Carlos
23
24
25
26
27
28

# EXHIBIT A

June 1, 1971

TRANS-ELECTRONIC MUSIC PRODUCTIONS, INC. (hereinafter referred
133 West 87th Street                          to as "TEMPI")
New York, N. Y. 10024

Attn: Mrs. Rachel Elkind

Gentlemen:

You represent and warrant that you are the owners of
or control all necessary rights in and to master recordings of
the musical selections entitled "Timesteps" and "Beethoven's
Ninth Symphony" (hereinafter called "Existing Music") as
arranged and recorded by Walter Carlos utilizing the so-called
"Moog Synthesizer."

Polaris Productions, Inc. (herein called "Polaris")
is producing a motion picture photoplay presently entitled "A
Clockwork Orange" (herein called the "Photoplay") and desires
to obtain the right to re-record the performances embodied in
said master recordings (hereinafter called "Masters") and in
addition desires to obtain from you new and original musical
compositions written and arranged by Walter Carlos and performed
by Walter Carlos on the Moog Synthesizer, for use in and in
connection with the sound track of the Photoplay.

This will confirm the agreement between you and Polaris
as follows:

1. At your sole cost and expense and on dates to be
mutually agreed upon by you and Polaris, you agree to cause
Walter Carlos to write and prepare arrangements of new and
original musical selections as Polaris may require and to per-
form on the Moog Synthesizer and record on master recordings
said new and original musical selections. The said new and
original musical compositions to be written, arranged and

cc. Boyd 8-71
    10-28-71
    Cranston
    1-11-72

Ex. A

formed on the Moog Synthesizer by Walter Carlos are hereinafter referred to as "New Music."

2.  You hereby give and grant to Polaris and Polaris shall have the right, but not the obligation, to re-record the performances from the Masters of the Existing Music and the New Music on the sound track of the Photoplay and Polaris shall have the sole and exclusive synchronization rights to be exercised in connection with the re-recordation of the Existing Music and the New Music, or any part or parts thereof, in the Photoplay, and its air, screen and television trailers and furthermore the unqualified and unrestricted right to publicly perform the same everywhere, for profit or otherwise and by all means and methods now or later known, free of any obligation to pay any fees of any kind to Walter Carlos or any other person or corporation.

3.  You agree to make available to Polaris magnetic tape copies of the Masters of the Existing Music and the New Music suitable for use in transferring the performances of the Existing Music and the New Music to the sound track of the Photoplay.

4.  You represent and warrant that you have all necessary rights in and to results and proceeds of the services of Walter Carlos and any other person or corporation who rendered services in connection with the writing, arranging and recording of the said Masters and you shall bear and be solely responsible for the payment of any and all costs of any kind and nature arising out of the manufacture and production of the said Masters.

5.  Polaris shall bear and shall be solely responsible for the payment of all costs arising out of the re-recording, assembly and handling of the said Masters and the transferring of the Existing Music and the New Music from the Masters to the

-2-
Ex. A

sound track of the Photoplay.

      6.   In addition to the aforesaid right to use the Masters to the Existing Music and the New Music for and in connection with the sound track of the Photoplay, you hereby give and grant to Polaris for an unlimited period of time the non-exclusive license, privilege and right (a) to make master recordings emboyding all or portions of the sound track of the Photoplay and any portion of the Existing Music or New Music written hereunder actually used in the sound track of the Photoplay as finally released, and to manufacture, distribute, publically perform, issue and sell so-called long-playing sound track recordings (hereinafter referred to as "Albums") of the music contained in the score of the Photoplay in all forms and devices for the reproduction of sound whether or not now known or contemplated (and including any device where sound is combined with pictures) throughout the world and the universe; and (b) to use the name, likeness and biography of Walter Carlos in connection with the advertising, publicizing or sale of the Albums, said right to be non-exclusive.

      7.   Polaris, its assignees and licensees shall bear and be solely responsible for the payment of all costs arising out of the manufacture, production, distribution and release of the Albums, including the cost of the transfer of the sound track of the Photoplay to such master recordings used for the production of the Albums as shall be prepared by Polaris or its assignees and licensees and for delivery, assembly and handling of the sound track of the Photoplay for such purposes.

      8.   In the event that Polaris shall find it necessary to and shall make re-recordings of all or any portion of the sound track of the Photoplay, you hereby grant to Polaris the right to make such re-recordings as shall be necessary, provided that Polaris shall make all payments required to be made to any persons or corporations rendering such services in connection

with such re-recordings.

9.  In consideration of the license and rights herein granted to Polaris by you and for all your undertakings pursuant hereto, Polaris agrees to pay to you the following compensation and royalties with respect to the Existing Music, the New Music and the said Albums:

(a)  To pay to you as a synchronization fee for the right to use the Existing Music and the New Music in and in connection with the sound track of the Photoplay the following amounts:

(i)  The sum of $500.00 for up to 30 minutes of New Music;

(ii)  The sum of $50.00 per minute for each minute of the Existing Music actually used in the sound track of the Photoplay as finally released.

(b)  To pay to you for and on account of the exploitation in the form of Albums of the Existing Music and the New Music, royalties as follows:

(i)  A royalty of 10% of the retail list price (excluding taxes and the recording company's standard charges for containers in which such Albums are sold, if any) on 90% of all such Albums manufactured and sold in the United States, its territories and possessions.  If any Existing Music or New Music by Walter Carlos in the sound track of the Photoplay is included with other musical compositions of the Photoplay or with any other recordings not contained in the Photoplay, then instead of the royalties set forth above you shall be entitled to receive such pro rata share of such royalties in the proportion that the playing time of the Existing Music and New Music performed by Walter Carlos bears to the total playing time of such record Albums.

- 4 -
Ex. A

(ii)  A royalty for Albums sold outside the
United States, its territories and possessions of one-half of
the royalty hereinbefore specified based upon the retail list
price (excluding taxes and the recording company's standard
charges for the cost of containers in which such Albums are
sold, if any) in the country of manufacture, the United States,
England, or the country of sale, at Polaris's election, on 90%
of all such Albums manufactured and sold, such royalties to be
computed in the national currency of the country to which the
list price so elected applies.  Such royalties hereunder shall
be due and payable only after payment has been received by
Polaris in the United States and shall be paid at the same rate
of exchange as Polaris was paid.  If Polaris does not receive
payment in the United States in dollars and elects to accept
payment in a foreign currency, Polaris may deposit to your
credit, and at your expense, in such currency in a depository
selected by you, your royalties based upon payments so
received by Polaris in a foreign currency as royalties hereunder
and shall notify you thereof promptly.  Such deposit as stated
above shall fulfill Polaris's obligation hereunder as to Album
sales as to which the royalties so deposited shall be applicable.

(iii)  As to Albums sold through mail order
record clubs or similar sales plans or devices and as to Albums
sold for promotional, sales incentive or educational purposes or
in the form of pre-recorded tape (in reel-to-reel, cartridge or
other form), a royalty of one-half (1/2) the royalty rate
otherwise payable; provided, however, that no royalty shall be
payable with respect to Albums given to members of record clubs
as "bonus" or "free" Albums as a result of joining the club,
obtaining new members or purchasing a required number of albums.
No royalty shall be payable with respect to Albums given away

- 5 -
Ex. A

or furnished on a no-charge basis to disc jockeys, radio stations, dealers or others, or sold as "cut-outs" after the listing of such album has been deleted from the catalogue of Polaris, its subsidiaries, affiliates or licensees.

(b)  In computing the number of Albums manufactured and sold hereunder, Polaris shall have the right to deduct returns and credits of any nature, including, without limitation, those on account of 100% or lesser return privilege, defective merchandise, exchange privilege, promotional credits, errors in billing, usable overstock and errors in shipment.

(c)  Statements shall be rendered and payments shall be made on account of royalties, if any, accruing to you hereunder on a semi-annual basis after the release of any Album containing the Existing Music or New Music. The semi-annual periods of six (6) consecutive months each shall be from January 1st to June 30th and July 1st to December 31st. Each statement shall be rendered within the period of sixty (60) days following the close of the semi-annual period to which it relates and shall be accompanied by a remittance of the amount accrued to you on the basis of receipts during such semi-annual period as indicated in such statement. Any statement rendered shall become final and binding upon you unless specific objection in writing is made within twelve (12) months from the date the same shall be delivered to you.

10.  Polaris shall have the right to and shall include on the Album containers credit to Walter Carlos in such form, size and location as Polaris shall determine in its sole discretion. However, in the event any other composer or performer shall receive credit on the front cover, a credit line in the same size typeface shall also be given to Walter Carlos. In addition, the

- 6 -
Ex. A

credit line on the liner note shall read "Composed, arranged and performed by Walter Carlos.  Produced by Rachel Elkind for TEMPI."

      11.  Notwithstanding the sole and exclusive synchronization rights in and to the Existing Music and the New Music granted to Polaris herein for use in the Photoplay, it is understood and agreed that you may grant the right to Columbia Record Corporation or another person, firm or corporation to use the Existing Music or the New Music in record Albums to be manufactured and distributed by Columbia Record Corporation or another person, firm or corporation; provided, however, that such other Albums containing all or any part of the Existing Music or the New Music shall not be released anywhere in the world earlier than four (4) months from and after the initial distribution in the United States of the Albums hereunder. In connection with other Albums issued by Columbia Record Corporation or any other person, firm or corporation, it is understood and agreed that any designation or reference to "A Clockwork Orange" in publicity or advertising on the jackets or Album covers of such Albums shall be subject to Polaris's right of prior written approval, which approval shall not be unreasonably withheld.

      12.  This agreement, its validity, construction and effect, shall be governed by the laws of the State of California applicable to agreements made and to be performed therein.

      13.  Any notices which you or Polaris may desire or may be required to give to the other in connection herewith shall be given by addressing the same to you at the address first above written and to Polaris at 9777 Wilshire Boulevard, Suite 918, Beverly Hills, California 90212, or at such other address as may be designated by you or Polaris by written notice and by depositing the same so addressed, postage prepaid, in

the United States mail or by delivering the same, toll prepaid, to a telegraph or cable company or by delivering the same personally to one of your officers or a Polaris officer.

14. Polaris shall have the right to assign this agreement or all of its rights hereunder to Warner Bros. or any Kinney affiliated record company; provided, however, that any such assignment shall be contingent upon Polaris causing such assignee to assume Polaris's obligations hereunder.

15. You represent and warrant that you have the full right and power to make this agreement and to grant the rights herein granted to Polaris and that you have not heretofore nor will you hereafter do any act or thing which will or may tend to derogate from, impair, prejudice or diminish any right or license granted Polaris hereunder. You agree to indemnify and hold Polaris and its officers, directors, employees, successors and assigns (herein "Indemnitees") harmless from and against any and all loss, cost, damage, liability and/or expense suffered or incurred by or threatened against said Indemnitees, or any of them (including reasonable attorney's fees) arising from or related to any breach or alleged breach by you of any agreement, representation or warranty hereunder.

16. If required by Polaris, you agree to require Walter Carlos and Rachel Elkind to report to Polaris at a site in England for consultation and he shall be required to render services hereunder in composing the New Music at TEMPI's studios in New York. Polaris agrees to provide Walter Carlos and Rachel Elkind with round-trip transportation from New York City to the site in England and agrees to pay or reimburse Walter Carlos and Rachel Elkind their reasonable living expenses while away from New York pursuant to the request of Polaris hereunder.

17. This agreement sets forth the entire agreement

- 8 -
Ex. A

between the parties with respect to the subject matter hereunder, and no modification, amendment, waiver, termination or discharge of this agreement of any of the provisions hereof shall be binding upon either party unless confirmed by written instrument signed by an officer of the party to be bound.

Please indicate your agreement to the foregoing by signing in the space provided below.

Very truly yours,

POLARIS PRODUCTIONS, INC.

By

Agreed and accepted:

TRANS ELECTRONIC MUSIC PRODUCTIONS, INC.

By

Agreed and accepted:

WALTER CARLOS

- 9 -
Ex. A

# EXHIBIT B

1  CALDWELL LESLIE & PROCTOR, PC
   CHRISTOPHER G. CALDWELL, SBN 106790
2  Email: caldwell@caldwell-leslie.com
   LINDA M. BURROW, SBN 194668
3  Email: burrow@caldwell-leslie.com
   TINA WONG, SBN 250214
4  Email: wong@caldwell-leslie.com
   1000 Wilshire Blvd., Suite 600
5  Los Angeles, California  90017-2463
   Telephone (213) 629-9040
6  Facsimile (213) 629-9022

7  Attorneys for Defendant and Counter-claimant
   WARNER BROS. ENTERTAINMENT INC.

8

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13 SERENDIP LLC & WENDY<br>CARLOS, | CASE NO. CV 08-07739 RGK (RCx) |
| 14 | |
| 15       Plaintiffs, | |
|       v. | |
| 16 | **DECLARATION OF EDWARD**<br>**PIERSON IN SUPPORT OF** |
| 17 WARNER BROS.<br>ENTERTAINMENT INC., | **WARNER BROS.**<br>**ENTERTAINMENT INC.'S**<br>**OPPOSITION TO PLAINTIFFS'** |
| 18 | **MOTION FOR PARTIAL**<br>**SUMMARY JUDGMENT** |
| 19       Defendant. | |
| 20 WARNER BROS.<br>ENTERTAINMENT INC. | [Defendant Warner Bros. Entertainment<br>Inc.'s Opposition to Plaintiffs' Motion |
| 21 | for Partial Summary Judgment; Statement<br>of Genuine Issues of Fact and Additional |
| 22       Counter-claimant, | Material Facts; Evidentiary Objections;<br>Declaration of Linda M. Burrow and |
| 23       v. | Exhibits Thereto filed concurrently<br>herewith] |
| 24 SERENDIP LLC, a New York limited<br>liability company, and WENDY | [[Proposed] Order Denying Plaintiffs' |
| 25 CARLOS, an individual, | Motion for Partial Summary Judgment<br>lodged concurrently herewith] |
| 26       Counter-defendants | |
| 27 | Date:        November 30, 2009<br>Time:        9:00 a.m. |
| 28 | Courtroom:   850 |

CALDWELL
LESLIE &
PROCTOR

# DECLARATION OF EDWARD PIERSON

I, Edward Pierson, declare and state:

1.  I am currently Adjunct Professor of Law at Southwestern Law School in Los Angeles California, where I have taught the course "Entertainment Law" for the past 18 years. I also serve on the School's Entertainment and Law Institute's International Advisory Board. I have been retained by Warner Bros. Entertainment, Inc. as an expert witness in this action. I make this declaration based upon my personal knowledge and expertise. If called to testify, I could and will testify competently thereto.

2.  I am co-author of the casebook "Law and Business of the Entertainment Industries", widely used in law schools across the country and published in its Fifth Edition by Praeger Publishers. I began co-authoring this casebook over twenty years ago. The casebook covers Music Publishing, Recorded Music and Film among other topics.

3.  I was the Executive Vice President, Legal and Business Affairs and General Counsel of Warner/Chappell Music from 2000 to 2008 in a role that expanded my duties as the chief legal counsel of the music publishing company I joined in 1989 and worked in the Legal and Business Affairs department for 19 years. In my position as General Counsel, I oversaw all aspects of the company's legal affairs (drafting of agreements, overseeing of claims, licensing agreement forms and settlement of licensing claims, worldwide copyright enforcement and litigation matters) as well as the company's business affairs (contract formulation, negotiation and administration). In the course of my work at Warner/Chappell, I handled major negotiations for music publishing rights with film studios including Warner Bros, New Line Cinema and Lucasfilm , as well as videogame companies including Microsoft, which included review and knowledge of composer, synchronization and music license agreements for numerous films, TV programs and games including the John Williams composed Star Wars and

-1-

"Indiana Jones" soundtracks, the "Lord of the Rings" soundtracks and the "Halo" and "Fable" game soundtracks.

4.      In October 2008, I received The American Bar Association Forum on the Entertainment and Sports Industries' Ed Rubin Service Award for exemplary service and leadership at its annual meeting. I have served as the Chairperson of the American Bar Association Forum Committee on the Entertainment and Sports Industries and was also the Chair of its Music and Personal Appearances Division.

5.      I opened a private law practice in 1978 specializing in entertainment and intellectual property law in Denver, Colorado and practiced there until 1989. A Phi Beta Kappa honor graduate of the University of Denver (BA, 1975), I earned my law degree from the University Of Denver College Of Law (JD, 1977) and I am an active member of the Colorado Bar.  Prior to 1989, I was an Assistant Adjunct Professor of Law at the University Of Denver College Of Law where I also taught Entertainment Law.

6.      Presently, I am a consultant in the music and video game industry and over the past twelve months my client list has included a major technology company that retained my services to advise them on music licensing issues. My non-disclosure agreement with such company prevents me from revealing further details.

7.      In preparation for this assignment I was provided with and read the Verified Amended Complaint (the "Complaint") filed in the United States District Court for the Central District of California, titled Serendip LLC & Wendy Carlos vs. Warner Bros Entertainment Inc., an Agreement pertaining to music for "A Clockwork Orange" dated June 1, 1971 attached as Exhibit A to the Complaint, a Composer Loanout Agreement and side letter dated January 25, 1980 in respect of music in "The Shining" ("Composer Agreement"), six (6) Synchronization and Master License Agreements from 2006 to 2009 in which

-2-

1  Serendip was the licensor and a copy of the Stanley Kubrick Directors' Series
2  box set that includes the films in questions.  Prior to this engagement, I had
3  owned a copy of "Switched-On Bach" and have seen both "A Clockwork
4  Orange" and "The Shining" and was unaware of any matters in dispute or
5  discussion between the Plaintiff and Defendant until I read the aforementioned
6  Complaint.

7      8.     The introductory paragraphs and subsequent provisions of the
8  Clockwork Orange Agreement evidence an agreement that was not a common
9  form as alleged in Paragraph 7 of the Complaint.  This Agreement combined a
10 synchronization license, a master use license agreement and a soundtrack royalty
11 agreement for an artist for compositions that were new original works as well as
12 performances and arrangements of public domain works (e.g. Beethoven's Ninth
13 Symphony"). Based upon my knowledge and experience of licensing agreements
14 for music entered into during this time, the many agreements which were
15 intended to include so-called "new media" rights did so by adding language to
16 the grant of rights clause stating rights also included distribution and uses by
17 "methods now or later known" or in "all media now or hereinafter devised".

18     9.     Further in respect of the introductory paragraphs on page 1 of the
19 Agreement, I believe the reference to "sound track" in paragraph 2 on page 1 is
20 intended to include within its scope and encompass all uses in (and in connection
21 with) the Photoplay (as distinguished from what is known as a "sound track
22 recordings" referenced and referred to later in the Agreement and defined as
23 "Albums" in Paragraph 6).

24     10.    In respect of Paragraph 2 of the Agreement, which is the primary
25 grant of rights clause, I believe Licensor granted to Licensee broad and extended
26 rights by the specific language of such Paragraph 2. In particular the last 47
27 words: "and furthermore the unqualified and unrestricted right to publicly
28 perform the same everywhere, for profit or otherwise and by all means and

1   methods now or later known, free of any obligation to pay any fees of any kind to
2   Walter Carlos or any other person or corporation". I believe the use and inclusion
3   of "and" in the phrase "and by all means and methods now or later known"
4   clearly evidences the intent of the parties to include all "methods" then or later
5   known and not limited to public performance rights. Expansion of rights to new
6   methods and new media by such language is and has been an expansion of the
7   synchronization rights as opposed to expansion of performance rights. This
8   opinion is based on my extensive experience reviewing and drafting many
9   licenses for the past 30 years. Further, had the parties intended to restrict all new
10  media rights in the grant, as some agreements then and now provide, it would
11  have been accomplished by omitting the phrase "and furthermore the unqualified
12  and unrestricted right to publicly perform the same everywhere, for profit or
13  otherwise <u>and</u> by all means and methods now or later known, free of any
14  obligation to pay any fees of any kind to Walter Carlos or any other person or
15  corporation". Inclusion of this provision, in my opinion was not intended in any
16  way to be limited to performance rights. Rather it was intended and included to
17  extend to all prior rights granted including the synchronization right.

18          11.    In respect of Paragraph 6 of the Agreement, I do not accept or agree
19  with the Plaintiff's claim that sale of home video copies comes within the scope
20  of sale of Albums for which Album Royalties should be paid under Paragraph 8
21  of the Agreement. This royalty was clearly intended to include and was limited to
22  "so called long-playing sound track recordings (hereinafter referred to as
23  "Albums") of the music in the score of the Photoplay" and clearly not the
24  Photoplay in a home video, DVD or any other format. In addition, the royalty
25  obligation in Paragraph 8 (b) of the Agreement was clear as to its scope "for and
26  on account of the exploitation in the form of albums" Moreover, the royalty
27  provisions of Paragraph 8 are clearly customary phonorecord royalty provisions
28  and it has not been industry custom, expectation or practice to pay so-called

phonorecord or Album Royalties to a composer or artist on video, DVD or downloaded copies of a film. A "long-playing sound track Album" is the scope of the royalty obligation in the Agreement and very different from the film with music embodied in it and distributed by other methods.

12.     In my experience in the Legal and Business Affairs Department of Warner/Chappell Music from 1989 to 2008, I have had substantial and extensive personal experience in the arena of amending music license agreements to provide for additional grants of rights to the licensee and pay additional fees to the licensor. Historically such arrangements are often the result of new technologies that may have not been contemplated at the time original rights were secured.

13.     The common drafting protection to address this situation which licensees sought to include in their agreements was to include, in the grant of rights the phrase "in all media now known or hereafter devised" or similar language. It is my opinion that the phrase in this 1971 agreement "by all means and methods now or later known" in the grant of rights is significant, and indicative of the intent of the parties then that no additional fees be paid for delivery of the film by a new method (e.g. home video, DVD or internet).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 13 day of November, 2009 at Los Angeles, California

Edward Pierson

-5-

# EXHIBIT C

**Subject:** Motion in Limine re: "Walter Carlos"
**From:** Linda Burrow <burrow@caldwell-leslie.com>
**Date:** Tue, 1 Dec 2009 16:35:15 -0800
**To:** "'Frederick H. Cohn'" <fcohn@frederickhcohn.com>
**CC:** "af102@nyc.rr.com" <af102@nyc.rr.com>, Tina Wong <wong@caldwell-leslie.com>

Fred –

Following up on our discussion prior to Dr. Einhorn's deposition, we respectfully decline your request that we agree not to refer to "Walter Carlos" at trial.

Linda

_____

Linda M. Burrow

**Caldwell Leslie**
Caldwell Leslie & Proctor, PC
1000 Wilshire Boulevard, Suite 600
Los Angeles, CA 90017-2463
Tel 213.629.9040 Fax 213.629.9022
burrow@caldwell-leslie.com

**www.caldwell-leslie.com**
The information contained in this electronic mail message is privileged and confidential and is intended for the personal use of the designated recipients only. This message may not be shared with, or forwarded to, third parties without the express written permission of the sender. If you have received this message in error, please notify the sender immediately and delete all copies. Thank You.